THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
DANIEL S. GOODMAN (Cal. State Bar # 126728)
Assistant United States Attorney
Deputy Chief, Criminal Division
     1200 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-4667
     Facsimile:  (213) 894-0141
     E-mail: daniel.goodman@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                UNITED STATES DISTRICT COURT

            FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | No. CR 08-679-FMC |
|---|---|---|
| Plaintiff, | ) | **CORRECTED** GOVERNMENT'S SENTENCING POSITION INCLUDING OBJECTIONS TO THE PRESENTENCE REPORT; DECLARATION OF ANTHONY F. GUARNIERI; EXHIBITS |
| v. | ) | |
| ABRAHAM LESNIK, | ) | Sentencing Date:  December 8, 2008 |
| Defendant. | ) | Sentencing Time:  2:00 p.m. |

     Plaintiff United States of America, by and through its

counsel of record, the United States Attorney for the Central

District of California, hereby files its sentencing position,

including objections to the Presentence Report ("PSR"), with

1 | respect to defendant Abraham Lesnik (hereinafter "the defendant"

2 | or "Lesnik").

3 | Dated: November 17, 2008

4 |                               Respectfully submitted,

THOMAS P. O'BRIEN
United States Attorney

CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division


DANIEL S. GOODMAN
Assistant United States Attorney
Deputy Chief, Criminal Division

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| TABLE OF AUTHORITIES | | iii |
| SENTENCING POSITION | | 1 |
| I | INTRODUCTION | 1 |
| II | FACTS | 2 |
| | A.  BACKGROUND | 3 |
| | B.  SUMMARY | 3 |
| | C.  LESNIK'S CONVICTION | 6 |
| III | OBJECTIONS TO THE PSR | 6 |
| | A.  GUIDELINES CALCULATIONS | 6 |
| |    1.  Comparison of PSR and Government Recommendations | 6 |
| |    2.  The Obstruction of Justice Enhancement Applies | 7 |
| | B.  SENTENCE RECOMMENDATION | 10 |
| |    1.  Imprisonment | 11 |
| |       a.  Lesnik Possessed a Tremendous Number of Classified Documents | 12 |
| |       b.  Lesnik Put Misappropriated Classified Information at Greater Risk by Traveling with it Abroad. | 13 |
| |       c.  Lesnik Jeopardized National Security. | 16 |
| |       d.  Lesnik Knew the Wrongfulness of What He Did. | 17 |
| |       e.  Lesnik's Obstructive Conduct Militates Against the Tremendous Variance Recommended by the PSR. | 17 |
| |       f.  The Principle of Deterrence Militates Against the Tremendous Variance Recommended by the PSR. | 18 |

i

**TABLE OF CONTENTS (CONT'D)**

Page

g.    Lesnik's History of Violating the Law Relevant to Security Issues Militates Against the Tremendous Variance Recommended by the PSR. . . . . . . . . . . . . . 19

h.    Lesnik's Health Issue Does Not Support the Tremendous Variance Recommended by the PSR. . . . . . . . . . . 20

i.    Nothing Else Supports the Tremendous Variance Recommended by the PSR. . . . . . . . . . . . . . . 21

2.    Fine . . . . . . . . . . . . . . . . . . 22

IV    CONCLUSION . . . . . . . . . . . . . . . . . . . 23

DECLARATION OF ANTHONY F. GUARNIERI . . . . . . . . . . . 24

# TABLE OF AUTHORITIES

Page(s)

## Cases

United States v. Austin,
    54 F.3d 394 (7th Cir. 1995) . . . . . . . . . . . . 9

United States v. Barnes,
    125 F.3d 1287 (9th Cir. 1997) . . . . . . . . . . 10

United States v. Booker,
    543 U.S. 220, 125 S. Ct. 738,
    160 L. Ed. 2d 621 (2005) . . . . . . . . . . . . 11

United States v. Brickey,
    289 F.3d 1114 (9th Cir. 2002) . . . . . . . . . . 22

United States v. Boyd,
    312 F.3d 213 (6th Cir. 2002) . . . . . . . . . . 10

United States v. Gray,
    521 F.3d 514 (6th Cir. 2008) . . . . . . . . . . . 9

United States v. Jimenez-Gutierrez,
    491 F.3d 923 (8th Cir. 2007) . . . . . . . . . . 19

United States v. Maccado,
    225 F.3d 766 (D.C. Cir. 2000) . . . . . . . . . . 9

United States v. Politano,
    522 F.3d 69 (1st Cir. 2008) . . . . . . . . . . . 19

United States v. Sayetsitty,
    107 F.3d 1405 (9th Cir. 1997) . . . . . . . . . . 10

United States v. Valdez,
    16 F.3d 1324 (2d Cir. 1994) . . . . . . . . . . . 9

United States v. Whited,
    539 F.3d 693 (7th Cir.  2008) . . . . . . . . . . 19

## Statutes

18 U.S.C. § 793(e) . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 3553(a) . . . . . . . . . . . . . 2, 11, 18, 20

iii

### TABLE OF AUTHORITIES (CONT'D)

Page(s)

**United States Sentencing Guidelines**

§1A1.3 . . . . . . . . . . . . . . . . . . . . . . . .  21

§2M3.3 . . . . . . . . . . . . . . . . . . . . . . .  6, 7

§3C1.1 . . . . . . . . . . . . . . . . . . . . . . .  passim

§3E1.1 . . . . . . . . . . . . . . . . . . . . . . .  6, 7

§5E1.2 . . . . . . . . . . . . . . . . . . . . . . .  22

**Internet Sources**

http://www.laalmanac.com/employment/em12.htm. . . . . . . .  23

http://northridge.stateuniversity.com/  . . . . . . . . .  23

Ponemon Institute, <u>Airport Insecurity: The Case
of Missing and Lost Laptops</u> (June 30, 2008)
(http://www.dell.com/downloads/global/services/
dell_lost-laptop-study.pdf) . . . . . . . . . . . . .  14

Testimony of Richard D. Pethia, Director,
CERT Centers, Software Engineering Institute,
Carnegie Mellon University, Pittsburgh,
Pennsylvania, before the House Committee on
Government Reform, Subcommittee on Government
Efficiency, Financial Management and
Intergovernmental Relations on November 19,
2002 (http://www.cert.org/congressional
testimony/pethia-11-02/Pethia testimony
11-19-02.html) . . . . . . . . . . . . . . . . . .  15

**Other**

Exec. Order No. 12958, as amended . . . . . . . . . . .  3, 16

iv

## SENTENCING POSITION

### I

### INTRODUCTION

As is typical in this era of "real offense sentencing," the offense to which the defendant pleaded guilty represents only a small fraction of his total criminal activity.  When "relevant conduct" is taken into account, the defendant is properly seen as having violated the law on a vast scale by secretively removing classified information from his workplace on a repeated basis, thereby amassing a huge collection of the nation's secrets on insufficiently protected computer equipment and computer media at his home.  Much of this information was classified at the level of "Top Secret" -- the highest of the three possible classification levels.

In addition to collecting at his home a large private hoard of classified information, the defendant put some of that information at even higher risk by traveling with it abroad.  He also lied on government security clearance forms, claiming that he had no foreign financial interests when in fact he had bank accounts in Switzerland and Israel.  Additionally, he obstructed justice during the investigation of this matter by failing to comply with a grand jury subpoena seeking computer equipment and classified information and by deleting files containing classified information from a computer after receiving that subpoena.

These were not innocent mistakes.  Lesnik knew full well the rules and the wrongfulness of his conduct, as well as the danger

to national security that his conduct presented.  As a result, the Guidelines call for a sentence of 78-96 months imprisonment.

Nonetheless, the government recommends and seeks a below-Guidelines sentence of four years imprisonment (48 months), plus supervised release and a fine.  The government committed in the plea agreement not to ask for a sentence of imprisonment exceeding 63 months, and its current recommendation is even lower than that.  The government's sentencing recommendation is based on the factors set forth in 18 U.S.C. § 3553(a), including a full assessment of Lesnik's offense and relevant conduct, his cooperativeness after he stopped obstructing justice, his age, his personal characteristics and lack of a criminal record, the needs of the community, and the sentences imposed in other cases involving classified information.

The Presentence Report calculates a Guidelines range of 63-78 months imprisonment but recommends a downward variance of more than five years, to a sentence of a year and a day.  For the reasons set forth below, this proposed variance is excessive. Although the government is recommending some leniency, a sentence of four years imprisonment is far more appropriate on the facts of this case than a sentence of a year and a day.

## II

### FACTS

This factual statement is derived from (1) the Declaration of Special Agent Anthony F. Guarnieri of the Federal Bureau of Investigation ("FBI") that is attached hereto ("Guarnieri Declaration"), (2) the exhibits to this sentencing position, (3) Lesnik's admissions at his change of plea hearing, (4) the PSR,

and (5) federal regulations.  The Guarnieri Declaration sets forth the pertinent facts in more detail.

## A.  BACKGROUND

Classified information is divided into three levels.  "Top Secret" information is information the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to the national security.  Exec. Order No. 12958, as amended, Section 1.3(a)(1).  "Secret" information is information the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security.  Exec. Order No. 12958, as amended, Section 1.3(a)(2).  "Confidential" information is information the unauthorized disclosure of which reasonably could be expected to cause damage to the national security.  Exec. Order No. 12958, as amended, Section 1.3(a)(3). This case involves information classified at the Secret and Top Secret levels.  Lesnik acknowledged in his plea agreement and at his change of plea hearing that the classified material involved in the count of conviction related to the national defense, and the other classified material he possessed was no different in that regard.

## B.  SUMMARY

At the time of the offense, Lesnik was a scientist working at Boeing Satellite Systems ("Boeing") in El Segundo, California, and holding a Top Secret security clearance.  In addition to his Top Secret clearance, he was cleared to work on what is known as Sensitive Compartmented Information.  He worked on a classified government project.  As a result, he spent much of his workday at Boeing in a Sensitive Compartmented Information Facility,

1 referred to as a "SCIF" (pronounced "skiff") -- a highly secure

2 physical location used for working with classified materials.

3    During his work on the classified government project at

4 Boeing, Lesnik surreptitiously downloaded classified information

5 from a computer in the SCIF onto a personal "thumb drive," and

6 smuggled the information, on the thumb drive, out of Boeing.  In

7 this manner, Lesnik accumulated a vast store of classified

8 information at his home.  On computer media that Lesnik

9 possessed, most of which were obtained during searches of his

10 home, the government found computer files containing more than

11 2000 documents marked as classified.  Of these documents, 1,676

12 were marked Secret and 400 of them were marked Top Secret.

13 See Exhibit ("Exh.") 1 [table].

14    At some point, Lesnik knowingly kept some of that classified

15 material in a simple storage locker.  The storage locker, at a

16 storage facility away from his home, was the means Lesnik used to

17 conceal from the FBI a large amount of classified material he

18 illegally possessed that was subject of a grand jury subpoena

19 served on him by the FBI.  Guarnieri Declaration, ¶¶ 21-25.  Both

20 by hiding the evidence of his crime (that is, classified

21 information) in a storage locker, id., and by attempting to

22 delete additional classified information from a computer (see

23 Exh. 2 [Defense Computer Forensics Laboratory ("DCFL") report]),

24 Lesnik attempted to conceal his crimes and obstruct the

25 investigation.

26    In addition to keeping classified material in his home and

27 in a storage facility, Lesnik traveled internationally in 2006

28 with a laptop computer holding some of this classified material.

4

1   See Guarnieri Declaration, ¶ 28.  This laptop computer and its
2   contents passed through airports in the United Kingdom and
3   Israel, and were abroad for two weeks.  By his reckless actions,
4   Lesnik further decreased the security of the classified material
5   he had misappropriated from Boeing.

6        Lesnik's conduct in secretly taking classified information
7   home was not only criminal but egregious.  More troubling,
8   however, is the fact that it was part of a pattern of deception
9   he engaged in that also included his making material false
10  statements on government security clearance forms.  Twice -- in
11  2002 and 2004 -- Lesnik falsely stated on such forms that he had
12  no foreign financial interests, when in fact he had bank accounts
13  containing substantial assets abroad.  At the time of his false
14  statement in 2002, he had accounts in Germany, Switzerland, and
15  Israel; at the time of his false statement in 2004, he had
16  accounts in Switzerland and Israel.  See Guarnieri Declaration,
17  ¶¶ 18-20; Exh. 3 [portions of Lesnik's 2002 and 2004 security
18  clearance forms]; Exh. 4 [evidence of financial interest in
19  Germany]; Exh. 5 [evidence of financial interest in Switzerland];
20  Exh. 6 [evidence of financial interest in Israel].[1]

21       Lesnik's act of lying on the security forms was of great
22  significance.  Questions about foreign assets are included on
23  government security clearance forms for good reason.  Knowledge
24  of such foreign assets is of critical importance to the

25

26       [1]  Lesnik's account in Israel contained approximately
27  $193,176 when Lesnik made the false statement in 2004.  [See
    Exh. 6.]  At the same time, Lesnik's account in Switzerland held
28  over $600,000.  [See Exh. 5.]

1  government in any analysis of a person's suitability for a
2  clearance.  Not only might the foreign assets indicate that the
3  applicant is receiving funds for services rendered to a foreign
4  government, but the existence of those assets (and the interest
5  earned by them) might show that the applicant is evading U.S. tax
6  law.

7  C.  LESNIK'S CONVICTION

8      Lesnik pleaded guilty on July 2, 2008, to a one-count
9  Information charging a violation of 18 U.S.C. § 793(e): Unlawful
10 Retention of National Defense Information.  (PSR, ¶¶ 1-2.)

11                              III

12                       OBJECTIONS TO PSR

13     The government adopts the findings and conclusions of the
14 PSR with the exceptions set forth in this document.

15 A.  GUIDELINES CALCULATIONS

16     1.  Comparison of PSR and Government Recommendations

17     The PSR recommends the following Guidelines calculations:

18         Base Offense Level :      29      [U.S.S.G. §2M3.3]

19         Adjustment         :      -3      [U.S.S.G. §3E1.1]
           (Acceptance of
20         Responsibility)

21         Total              :      26

22         Range at Criminal History Category I: 63-78 months
23 (PSR, ¶¶ 18-31.)

24     The government submits that an enhancement not included by
25 the PSR should be applied:  the two-level enhancement for
26 obstruction of justice under U.S.S.G. §3C1.1.  Hence, the
27 government submits that the Guidelines calculations should look
28 like this:

                              6

| | | |
|---|---|---|
| Base Offense Level : | 29 | [U.S.S.G. §2M3.3] |
| Obstruction of Justice | +2 | [U.S.S.G. §3C1.1] |
| Adjustment : (Acceptance of Responsibility)[2] | -3 | [U.S.S.G. §3E1.1] |
| Total : | 28 | |

Range at Criminal History Category I: 78-96 months

2. **The Obstruction of Justice Enhancement Applies**

During the investigation of this case -- specifically, at the time of the search of Lesnik's home on August 24, 2006 -- the FBI served Lesnik with a grand jury subpoena for any and all computer equipment and storage devices and any classified information. Guarnieri Declaration, ¶ 17. Lesnik intentionally failed to turn over all his computer media to the government in response to that subpoena. He did not turn over computer equipment and storage devices containing classified information -- the equipment and storage devices that he had recently secreted in a storage locker. Guarnieri Declaration, ¶¶ 21-25.

The FBI discovered through surveillance that Lesnik had a storage locker at a storage facility in a city adjacent to his home. Guarnieri Declaration, ¶¶ 21-23. The FBI observed Lesnik engage in what appeared to be surveillance detection activity when he went to the storage locker. Guarnieri Declaration, ¶ 21. The FBI also saw Lesnik remove materials from the storage locker

---

[2] The government deems that Lesnik has accepted responsibility as of this writing and therefore recommends that he be awarded a three-point reduction in Guidelines offense level pursuant to U.S.S.G. §3E1.1.

1  and take them home.  Guarnieri Declaration, ¶ 22.  These

2  observations by the FBI necessitated a further search of Lesnik's

3  home, in which the FBI found further computer equipment/media

4  containing classified information.  Guarnieri Declaration, ¶ 25.

5      Among the computer equipment/media was the Acom external

6  hard drive, <u>see</u> Guarnieri Declaration, ¶ 25, which contained all

7  the classified documents listed in the Information to which

8  Lesnik pleaded guilty.  The Acom external hard drive was found in

9  a bathroom cupboard, behind some books; that precise location had

10  been searched by another agent in the search on August 24, 2006.

11  <u>Id.</u>  Moreover, Lesnik deleted files responsive to the subpoena on

12  a computer after he received the subpoena on August 24, 2006.

13  Exh. 2 [DCFL report].  For both these reasons, Lesnik's conduct

14  was obstruction of justice within the meaning of U.S.S.G. §3C1.1.

15      Section 3C1.1 provides that the two-level obstruction of

16  justice enhancement is applicable "if (A) the defendant willfully

17  obstructed or impeded, or attempted to obstruct or impede, the

18  administration of justice during the course of the investigation

19  . . . of the instant offense of conviction, and (B) the

20  obstructive conduct related to (i) the defendant's offense of

21  conviction and any relevant conduct; or (ii) a closely related

22  offense."  The Commentary to this Guideline contains "a non-

23  exhaustive list of examples of the types of conduct to which this

24  adjustment applies," U.S.S.G. §3C1.1, comment. (n.4), and

25  provides that one example of obstructive conduct is "concealing

26  . . . evidence that is material to an official investigation."

27  <u>Id.</u>, comment. (n.4(d)).  The express mention of this conduct as

28

8

1  an example of obstruction of justice flies in the face of the

2  PSR's assertion that "[n]one of the listed examples [in

3  application note 4 of U.S.S.G. §3C1.1] seem to refer to conduct

4  in which Lesnik engaged."  (PSR, ¶ 25.)

5      Although the government's research has not found that the

6  Ninth Circuit has addressed the issue of whether failure to

7  comply with a grand jury subpoena constitutes obstruction of

8  justice under the Guidelines, that research indicates that every

9  circuit to have considered this issue has said that such failure

10  to comply is obstruction.  Two of these circuit cases relate

11  specifically to the withholding of documents -- the precise

12  situation presented here.  United States v. Gray, 521 F.3d 514,

13  543 (6th Cir. 2008) (district court's finding that a defendant

14  had "withh[eld] documents that were responsive to grand jury

15  subpoenas . . . provided sufficient justification for application

16  of the obstruction of justice enhancement"); United States v.

17  Austin, 54 F.3d 394, 403-04 (7th Cir. 1995) ("Austin's failure to

18  turn records of the Hanson sales over to the grand jury despite a

19  subpoena also constitutes obstruction.").  Two other circuit

20  cases relate to the withholding of handwriting samples -- a

21  highly analogous situation.  See United States v. Maccado, 225

22  F.3d 766, 771 (D.C. Cir. 2000) ("'there are few better examples

23  of a classic obstruction of justice than a defendant who refuses

24  to give handwriting samples when compelled by subpoena'"); United

25  States v. Valdez, 16 F.3d 1324, 1335 (2d Cir. 1994) (same).  All

26  these cases are in line with the above-quoted language from the

27  Commentary to §3C1.1, stating that concealing evidence material

28

1  to an official investigation constitutes obstruction.   U.S.S.G.

2  §3C1.1, comment. (n.4(d)).

3       At any rate, Lesnik's deletion of computer files responsive

4  to the subpoena constitutes obstruction of justice.   The

5  Commentary to U.S.S.G. §3C1.1 provides that "destroying . . .

6  evidence that is material to an official investigation"

7  constitutes obstruction of justice.   Id., comment. (n.4(d)).

8  Lesnik's deletion of computer files falls squarely within this

9  proscription.   See, e.g., United States v. Boyd, 312 F.3d 213,

10 217 (6th Cir. 2002).

11      It is not necessary for the parties to litigate whether

12 Lesnik's conduct in failing to turn over responsive documents and

13 deleting computer files served in fact to obstruct or impede the

14 government's investigation.   The law does not require that

15 Lesnik's conduct had an actual effect on the investigation; his

16 intent to obstruct it is enough.   United States v. Barnes, 125

17 F.3d 1287, 1292-93 (9th Cir. 1997); United States v. Sayetsitty,

18 107 F.3d 1405, 1410 (9th Cir. 1997).

19 **B.   SENTENCE RECOMMENDATION**

20      Despite its own guidelines calculations, which would require

21 Lesnik to serve 63-78 months in prison, the PSR recommends that

22 Lesnik be sentenced to the far lesser term of a year and a day.

23 It also recommends that no fine be imposed on Lesnik, concluding

24 that he does not have the ability to pay.   Neither of these

25 recommendations withstands scrutiny.

26

27

28

10

1    1. **Imprisonment**

2    The PSR recommends a "Booker variance"[3] of more than five

3    years, or, put differently, a reduction of sentence by more than

4    80%.  The government submits that a Booker variance of this

5    magnitude is entirely unwarranted.

6    The justification given by the PSR appears to include the

7    following: (1) Lesnik's guilty plea, cooperation with the

8    Probation Office, acceptance of responsibility, and lack of prior

9    criminal history; (2) a comparison -- never set forth -- of

10   Lesnik's conduct "with the conduct of others convicted of similar

11   crimes" (3) the conclusion that Lesnik's conduct never

12   "jeopardized national security" and that Lesnik did not intend

13   "to do anything with the information he possessed"; (4) the

14   observation that the sentencing guideline applicable to Lesnik

15   carries with it a base offense level that is higher than that for

16   many other very serious offenses; (5) the assertion that the

17   recommended sentence complies with the purposes set forth in 18

18   U.S.C. § 3553(a)(2), a highly subjective, if not circular,

19   conclusion by the Probation Office given that one of these

20   purposes is "[t]o reflect the seriousness of the offense; to

21   promote respect for the law; and to provide just punishment for

22   the offense"; (6) the conclusion that the recommended sentence is

23   enough to deter Lesnik from future criminality; (7) an analysis

24   of Lesnik's future dangerousness; and (8) the statement that

25

26

27    _____

      [3]   See generally United States v. Booker, 543 U.S. 220, 125

28   S. Ct. 738, 160 L. Ed. 2d 621 (2005).

1   Lesnik has a health disorder and takes medication on a daily

2   basis.  (See PSR, Recommendation Letter, pp. 2-3.)

3        The government submits that under the totality of the

4   circumstances, these purported justifications do not warrant the

5   sentence recommended by the PSR.

6              a.   **Lesnik Possessed a Tremendous Number of Classified**

7                   **Documents.**

8        During his change-of-plea hearing, Lesnik admitted that he

9   removed classified documents from the SCIF at Boeing by

10  downloading them onto a thumb drive, and that he took these

11  classified documents home.  The searches of Lesnik's home

12  conducted in this case revealed that he had files containing

13  classified information on 31 different "media sources" -- floppy

14  disks, hard drives, removable USB drives, and ZIP drives.  See

15  Exh. 1 [table].  Forensic examination of these media sources by

16  the DCFL found that those media sources held 2,076 files

17  containing documents marked classified:  1,676 documents marked

18  Secret and 400 documents marked Top Secret.  Id.[4]

19  _____

20       [4]  An explanation of methodology is appropriate here.  The
    number of classified files identified by DCFL includes those in
21  "unallocated space," meaning those files that had been "deleted"
    but remained forensically retrievable from the media source.  The
22  number of files is of total documents, a concept expressed in the
    chart by the phrase "non-unique documents" -- meaning that this
23  count would include identical copies of the same document.  The
    DCFL was able to determine forensically that the numbers of
24  "unique documents" were 1,149 Secret documents and 192 Top Secret
    documents.  See Exh. 7 [table].  These documents were "unique" in
25  the sense that there was no identical copy of the document
    elsewhere in any of the media sources, although a "unique"
26  document could differ from another document only in the sense
    that it had a different title, a changed character, a different
27  format, an extra space, or the like.
28

                                  12

1      The largest number of classified documents on any single

2  media source was on the Acom hard drive that Lesnik had hidden in

3  his storage locker and failed to turn over to the FBI.   That hard

4  drive contained 917 files classified at the Secret or Top Secret

5  level, including 224 Top Secret files -- more than half the total

6  number of Top Secret files Lesnik possessed.   See Exh. 1 [table].

7      Analyzing the classified documents from the standpoint of

8  file size, rather than number of files, the DCFL found that the

9  Acom hard drive that Lesnik hid in the storage locker held 1,352

10 of the 2,592 megabytes (MB) of files containing documents with

11 classified markings (more than half of all classified file space

12 in Lesnik's possession), and 633 of the 1,122 MB of files

13 containing documents marked Top Secret (again, more than half of

14 all file space).   See Exh. 8 [table].

15     The graphic attached hereto as Exhibit 9 gives some idea of

16 how many classified documents Lesnik possessed.   Using an

17 estimate of 300 words per page and 250 pages per inch, the

18 classified documents Lesnik possessed, if printed out, would form

19 a stack of paper more than 22 feet high.

20          b.    Lesnik Put Misappropriated Classified Information

21                at Greater Risk by Traveling with it Abroad.

22     The evidence demonstrates that Lesnik took his Compaq laptop

23 computer with him on his overseas trip in 2006:   It has been

24 established forensically that when Lesnik was overseas, data was

25 moved between one of Lesnik's thumb drives and that laptop (both

26 of which were seized in searches of Lesnik's home).   See Exh. 10

27 [DCFL Report]; Guarnieri Declaration, ¶ 28.   Lesnik took this

28

13

laptop on his trip after Boeing had denied him permission to take his Boeing-issued laptop.  Guarnieri Declaration, ¶ 6c.

The fact that Lesnik traveled overseas with classified information on his laptop also militates against a reduced sentence.  He took abroad, for two weeks, material that should never have left secure locations within Boeing.  He traveled both outbound and inbound through airports in California (LAX) London (Heathrow) and Israel (Tel Aviv).  See Exh. 11 [itinerary found in search].  His laptop was all the while subject to loss and theft, and the information on it subject to compromise.

These risks were substantial.  According to an estimate in a study entitled Airport Insecurity: The Case of Missing and Lost Laptops (June 30, 2008) conducted by the Ponemon Institute, LLC, a research group, more than 12,000 laptops are lost each week in U.S. airports by business travelers alone, a number than includes theft and other losses.  (http://www.dell.com/downloads/global/services/dell_lost-laptop-study.pdf at p. 3 (last visited Nov. 8, 2008.))  The same study found that LAX, through which Lesnik traveled twice, had the highest weekly frequency of laptop loss of any airport in the United States, approximately 1,200 laptops a week.  (P. 4.)  Additionally, travel brings with it the additional risks that a laptop will be lost or stolen in a place other than an airport, such as a temporary living space or taxicab.

During his travel, Lesnik placed the information on his laptop computer at further risk by connecting to the Internet.

14

1  He used this computer to connect, via the Internet, from London

2  to the Boeing computer and from Israel to the Boeing computer.[5]

3     Lesnik's connecting to the Internet put at higher risk the

4  classified materials on his computer.  The Internet is a avenue

5  for hackers, criminals, terrorists, and even governments to steal

6  data from computers belonging to others.  See generally, e.g.,

7  Testimony of Richard D. Pethia, Director, CERT Centers, Software

8  Engineering Institute, Carnegie Mellon University, Pittsburgh,

9  Pennsylvania, before the House Committee on Government Reform,

10 Subcommittee on Government Efficiency, Financial Management and

11 Intergovernmental Relations on November 19, 2002 (http://

12 www.cert.org/congressional testimony/pethia-11-02/Pethia

13 testimony 11-19-02.html (last visited Nov. 4, 2008)).  Such

14 concerns are not frivolous.  In this case, it appears that, at a

15 time before Lesnik traveled to Israel, "an automated process may

16 have attempted to access the system" on his Compaq laptop

17 computer.  See Exh. 13 [DCFL report].

18

19

20 _____

21     [5] According to Boeing computer logs, Lesnik logged into the
   unclassified Boeing computer network via the Internet on June 28,
22 2006, at 11:10 a.m. Pacific Daylight Time (PDT).  (See Exh. 12,
   p. 5 [Spreadsheet of Lesnik Internet log-ins to Boeing
23 unclassified computer].)  The itinerary for Lesnik's overseas
   trip indicates that Lesnik was to be in London, en route to
24 Israel, at that time.  (See Exh. 11 [itinerary].)  Lesnik logged
   into the unclassified Boeing network on June 29, 2006, at 10:51
25 p.m. PDT, from Tel Aviv.  According to the itinerary, Lesnik was
26 to arrive in Tel Aviv on June 29, 2006 -- PDT -- the same day.

27     Additional proof that Lesnik logged onto the Internet while
   he was in Israel is derived from the forensic analysis of
28 Lesnik's laptop computer.  See Guarnieri Declaration, ¶ 29.

1

      c.  <u>Lesnik Jeopardized National Security.</u>

2

    The PSR says that Lesnik's conduct did not "jeopardize

3 national security." (PSR, Recommendation Letter, p. 3.)  The PSR

4 is incorrect.  Improperly safeguarded classified information by

5 definition jeopardizes national security (<u>see</u> Exec. Order No.

6 12958, as amended, Section 1.3(a)), and damage is done as soon as

7 information is subject to unauthorized acquisition.  Although we

8 have no reliable evidence that Lesnik transferred the classified

9 information he possessed, that does not mean his actions did not

10 jeopardize and even damage national security.

11

    As set forth earlier herein, Lesnik's illegal removal of

12 classified documents from Boeing and his recklessness in taking

13 one of his laptop computers abroad when it contained classified

14 documents, and connecting to the Internet, jeopardized national

15 security.  By the same token, a drunk driver jeopardizes public

16 safety even if he doesn't actually hit anyone, and a person who

17 runs a meth lab using volatile chemicals in a densely populated

18 area jeopardizes his neighbors even if the lab never blows up.

19

    Moreover, the removal of classified information from a

20 protected area in a case such as this means that the government

21 cannot be sure that no unauthorized person has had access to that

22 information.  Such access could have occurred in Lesnik's home,

23 in the storage locker, or overseas.  Because the government

24 cannot be sure the information has not been compromised, the

25 value of the information is significantly diminished.  In this

26 sense, Lesnik inflicted very real damage on the United States.

27

    Lastly, evidence of harm to national security is not always

28 easy to come by.  For instance, electronic media, such as thumb

drives and computer hard drives, can be imaged (copied fully and identically) in such a way as not to leave electronic evidence that such an image was taken.  Guarnieri Declaration, ¶ 30. Hence, classified data could have been copied from the computer media Lesnik illegally had in his home, his storage locker, or his temporary apartment in Israel, without Lesnik, or the government, ever knowing about it.

### d.  Lesnik Knew the Wrongfulness of What He Did.

Having worked for defense contractors since 1979, Lesnik knew the importance of protecting classified information.  His crime was no mere slip-up.  Rather, he deliberately and deviously, over an extended period of time, removed classified information from Boeing, and retained that information in his home and in a storage locker, contrary to what he knew was the law of the United States.

Lesnik admitted at the guilty plea hearing that he knew his conduct was illegal.  There was a sign on the SCIF that specifically prohibited the bringing in of thumb drives.  <u>See</u> Exh. 14 [warning sign]; Guarnieri Declaration, ¶ 13c.  Moreover, while at Boeing, Lesnik had received repeated security training. <u>See</u> Exh. 15.  Indeed, during his years working for defense contractors, Lesnik had signed at least five security agreements, two of them during his employment at Boeing.  <u>See</u> Exh. 16 [summary chart] and Exh. 17 [Boeing security agreements].

### e.  Lesnik's Obstructive Conduct Militates Against the Tremendous Variance Recommended by the PSR.

The same facts that justify the imposition of the Obstruction of Justice enhancement under U.S.S.G. §3C1.1 in

1 calculating the Sentencing Guidelines argue against the
2 extraordinary variance recommended in the PSR.   Factoring
3 Lesnik's obstructive conduct into the consideration of how much
4 variance is appropriate is not double-counting.   In a situation
5 where a defendant seeks the leniency of the court in going below
6 the guidelines range, is proper to consider any evidence bearing
7 on the whether and how much leniency should be granted.

8       f.   **The Principle of Deterrence Militates Against the**
9            **Tremendous Variance Recommended by the PSR.**

10     Section 3553(a)(2) lists the need for the sentence "[t]o
11 afford adequate deterrence to criminal conduct" as one of the
12 factors a sentencing judge must consider.   The PSR appears to
13 analyze deterrence solely in terms of the need or lack of a need
14 to deter Lesnik from further crime, especially further crime of
15 this type.   (See PSR, Recommendation Letter, p. 3 ["Adequate
16 Deterrence"].)   That is, the PSR seemingly interprets the word
17 "deterrence" in § 3553(a)(2) as meaning only specific deterrence.
18 It fails to consider -- at least expressly -- the message the
19 sentence will send to the thousands of other scientists and
20 engineers in this country who have access to classified
21 information.   At a time when defense technology is critical not
22 only to our military but to our fight against terrorism both at
23 home and abroad, the United States can ill afford the damage that
24 could be inflicted in a future case if national defense
25 information were to fall into the wrong hands.

26     Section 3553(a)(2) is widely viewed as encompassing the
27 concept of general deterrence of others who might commit the same
28 crime as well as specific deterrence of the individual defendant.

1  E.g., United States v. Whited, 539 F.3d 693, 697, 699 (7th Cir.

2  2008); United States v. Politano, 522 F.3d 69, 73-74 (1st Cir.

3  2008); United States v. Jimenez-Gutierrez, 491 F.3d 923, 927 (8th

4  Cir. 2007).  The need for general deterrence supports the view

5  that four years imprisonment is an appropriate sentence, whereas

6  a year and a day is not.

7       There is also a need to deter Lesnik from disclosing

8  classified information he has in his head.  Lesnik has shown

9  himself willing to engage in conduct that puts classified

10 information at risk in violation of known law and duty.  His

11 obligation to safeguard the classified information he possesses

12 in his head continues, and he must be deterred from engaging in

13 further illegal mishandling of this classified information.

14       g.    Lesnik's History of Violating the Law Relevant to

15             Security Issues Militates Against the Tremendous

16             Variance Recommended by the PSR.

17       As the government set forth on pages 5 and 6 of this

18 sentencing position, Lesnik lied on government security clearance

19 forms in 2002 and 2004 by saying he had no foreign financial

20 interests, whereas in truth he did.  This point argues against

21 extreme leniency in the form of the five-year variance from the

22 Sentencing Guidelines recommended by the PSR.

23       h.    Lesnik's Health Issue Does Not Support the

24             Tremendous Variance Recommended by the PSR.

25       To protect Lesnik's privacy, this factor is discussed in the

26 government's Under Seal Addendum to the Government's Sentencing

27 Position, being filed contemporaneously herewith.

28

                                19

i.   <u>Nothing Else Supports the Tremendous Variance</u>
<u>Recommended by the PSR.</u>

Under the heading, "Respect for Law," the PSR cites Lesnik's guilty plea, cooperation with the Probation Office, acceptance of responsibility, and lack of prior criminal history.  (PSR, Recommendation Letter, p. 2.)   These factors, however, are already reflected in his receiving a three-level reduction in his Guidelines offense level as credit for acceptance of responsibility and in his Criminal History Category of I. Moreover, Lesnik's egregious conduct, which occurred over a period of time, shows his <u>lack</u> of respect for the law, as does his lying on security clearance forms with regard to his foreign financial interests.

Lesnik's diminished future dangerousness, although a factor the government considered in arriving at its sentencing recommendation, can be taken only so far.   It is still necessary that the sentence imposed reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and deter others.   <u>See</u> 18 U.S.C. § 3553(a)(2)(A).

The PSR's statement that the recommended variance is justified by a comparison of Lesnik's sentence "with the conduct of others convicted of similar crimes, the sentence imposed on similarly situated co-participants and the need to avoid unwarranted sentencing disparity" (PSR, Recommendation Letter, p. 3) is unexplained and unpersuasive.   There are no "co-participants" in this case.   The PSR does not elaborate on its mention of "others convicted of similar crimes" or "the need to avoid unwarranted sentencing disparity."   Any such discussion

20

1   will require detailed attention to all the facts, and this case

2   is likely to be distinguishable from other cases based on the

3   quantity of pilfered documents, Lesnik's obstructive conduct,

4   Lesnik's history of false statements on security forms, and

5   Lesnik's recklessness in taking Secret and Top Secret documents

6   abroad on his computer on a family vacation.  Cf. U.S.S.G. §1A1.3

7   comment., former Introduction and General Application Principles,

8   A3 (p.s.) ("The list of potentially relevant features of criminal

9   behavior is long; the fact that they can occur in multiple

10  combinations means that the list of possible permutations of

11  factors is virtually endless.").

12      The PSR's similar comparison of the offense of conviction to

13  other "very serious offenses" does not end in any conclusion but

14  is apparently intended to show that the Guidelines overstate the

15  seriousness of Lesnik's offense.  (PSR, Recommendation Letter, p.

16  3.)  This is an entirely subjective judgment and one with which

17  the government strongly disagrees as a general matter, as did

18  Congress in establishing the relevant guideline.  As a matter of

19  this particular case, the government agrees that the Guidelines

20  overstate the appropriate punishment for this offender only

21  insofar as the government has recommended a specific below-

22  Guidelines sentence.  The Sentencing Commission analyzed data

23  from 10,000 presentence investigations even before it issued the

24  Guidelines (U.S.S.G. §1A1.3 comment., former Introduction and

25  General Application Principles, A3 (p.s.)) and now has nearly 20

26  years of data with which to reassess the Guidelines.  Its

27  conclusions should not be dispatched as easily as the PSR would

28  have it.

21

2.   **Fine**

It is the burden of a defendant to show he is unable to pay a fine, not the burden of the government to show that a defendant is able to pay.  See U.S.S.G. §5E1.2(a); United States v. Brickey, 289 F.3d 1114, 1152 (9th Cir. 2002).

The PSR recommends that no fine be imposed because Lesnik "does not have the ability to pay." (PSR, Recommendation Letter, p. 1; see also PSR, ¶¶ 61-62.) The government objects to this conclusion and recommendation. Lesnik has a net worth of more than $2.3 million. (PSR, ¶ 59.) According to the PSR, more than $126,000 of this is in cash. (Id.) The fine range under the Sentencing Guidelines as calculated by either the government or the PSR is $12,500 - $125,000. Given Lesnik's wealth, the government submits that he should be ordered to pay a fine at or near the top of the guideline range.

This amount seems well within Lesnik's reach. He has more than $126,000 in cash. One of his assets is a time-share property valued at $35,000 (PSR, ¶ 59), which the government believes is in Florida. This could be liquidated if necessary. Moreover, Lesnik retains some earning capacity, even though the PSR reports that Lesnik has had difficulty finding a job in the time since he was fired from Boeing. (PSR, ¶ 60.)[6]  Finally, Lesnik's claimed necessary living expenses of $143,976 annually

---

[6]  The PSR gives no indication of how actively Lesnik has looked for a job or what kind of jobs he has sought out. It is perfectly reasonable to expect him to take a job that pays substantially less than the jobs he could have gotten had he not committed this crime.

22

1 seems exorbitantly high -- and certainly should not prevent

2 Lesnik from paying his full debt to society.[7]

IV

CONCLUSION

5     The government recommends that the Court impose a custodial

6 sentence of four years imprisonment.  With regard to supervised

7 release, the government joins the PSR in recommending a term of

8 three years, the high end of the Guidelines range of 2-3 years.

9 (PSR, Recommendation Letter, p. 1; PSR, ¶¶ 68 & 70.)  With regard

10 to the fine, the government submits that is it appropriate that

11 Lesnik be ordered to pay a fine at or near the top of the

12 Guidelines range of $12,500 to $125,000.

---

17     [7]  The PSR does not identify any large expenses.  Lesnik's

18 legal expenses are now satisfied.  (PSR, ¶ 60.)  Lesnik and his
wife have only a single child living at home, and that child is

19 no longer a minor.  (PSR, ¶ 47.)

20     In contending that Lesnik's claimed monthly expenses are

21 "reasonable," the only expense the PSR mentions is that "Lesnik
is paying his youngest son's college tuition."  (PSR, ¶ 60.)

22 There is no tuition for in-state students at California State
University at Northridge, where his youngest son is at school

23 (PSR, ¶ 46), although there are required fees of $3,042 annually.
See http://northridge.stateuniversity.com/ (last visited

24 11/5/2008).  This amount is a small percentage of Lesnik's
claimed annual necessary expenses of $143,976 -- expenses that

25 are not itemized in the PSR.

26     Overall, Lesnik's claimed "necessary' annual living expenses

27 are more than three times the estimated median household income
in Los Angeles County: $42,189 as of 2005.  See http://

28 www.laalmanac.com/employment/em12.htm.

23

D E C L A R A T I O N

I, Anthony F. Guarnieri, declare as follows:

1.  I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed for 12 years. During this time I have investigated counterintelligence matters and criminal violations of federal laws, including federal laws concerning espionage.  As do all FBI Special Agents, I have a security clearance at the Top Secret level.  Prior to joining the FBI, I received a Bachelor of Science degree in Information and Computer Science from the University of California, Irvine, in 1982.  After graduating from college, I worked at McDonnell Douglas as a computer software engineer and a systems manager, ultimately being promoted to a supervisory position at McDonnell Douglas in these areas.

2.  This declaration is made in support of the government's sentencing position in United States of America v. Abraham Lesnik, CR 08-679-FMC.

3.  This declaration sets forth only the portions of the investigation that I believe at this time are relevant for sentencing and does not set forth all of the information known to me concerning this case.  Moreover, although many of the items seized in this case contain classified information, I have included in this declaration only unclassified information.

4.  On July 10, 2006, I attended a meeting at Boeing during which I learned from Boeing's Director of Security that an initial search of an employee's Boeing-issued laptop computer yielded, among other things, approximately 30 classified documents (classified up to the level of Top Secret) and

24

correspondence with and/or pertaining to overseas banks.
Boeing's Director of Security identified the employee as ABRAHAM
LESNIK ("LESNIK"), an employee of Boeing Satellite Systems,
located in El Segundo, California (hereinafter all Boeing
entities and affiliates are referred to collectively as
"Boeing").  The Director of Security further stated:

a.   In late May 2006, LESNIK's supervisor confiscated
LESNIK's Boeing-issued laptop computer due to LESNIK's repeated
violations of company policy involving his use of business
equipment for personal purposes.

b.   That same day, LESNIK retained counsel who
contacted Boeing to assert that LESNIK maintained personal
information on his Boeing laptop and LESNIK did not consent to a
search of his personal information.

c.   LESNIK filed a lawsuit, seeking a temporary
restraining order to stop Boeing from searching the laptop, which
the court denied.  Thereafter, Boeing caused a search of the
laptop to be performed and discovered the classified documents
and other material on the laptop.

d.   LESNIK traveled to Israel from June 27, 2006 to
July 10, 2006, and was scheduled to return to work at Boeing the
next day.

5.   On July 27, 2006, I attended a meeting at Boeing with
several Boeing employees, who told me the following:

a.   Boeing hired LESNIK on March 26, 2004, as an
Engineer/Scientist.  LESNIK holds a Top Secret, Sensitive
Compartmented Information ("TS/SCI") clearance.  Between May 20,
2005, and June 20, 2005, LESNIK was issued a laptop computer by

25

Boeing to be used for work.  The laptop computer issued by Boeing to LESNIK was for use on unclassified material only.

       b.   On June 20, 2006, Boeing Security interviewed LESNIK, who claimed that all the data on the laptop was "personal."  LESNIK said the laptop contained no work product or proprietary or classified data.

       c.   On June 30, 2006, Boeing IT Forensics personnel imaged the laptop and searched the imaged drive, which was found to contain classified documents relating to national defense programs.

       d.   On July 5, 2005, Boeing El Segundo Security staff conducted a review of the imaged drive and found, among other items, approximately 30 classified documents and correspondence with foreign banks.

       e.   On July 11, 2006, LESNIK returned from a vacation to Israel and was interviewed by Boeing Security.  When told that classified information was found on his Boeing-issued laptop, LESNIK denied knowing how to transfer data from classified systems.  LESNIK admitted that he was aware of computer security policies.  LESNIK said the classified data may have been loaded by his manager after the manager confiscated the laptop.

       f.   On July 11, 2006, Boeing placed LESNIK on suspension pending completion of its investigation.

       g.   On July 19, 2006, Boeing Security interviewed LESNIK's manager, who said that he confiscated LESNIK's laptop for abuse of company policy, did not know that the laptop contained classified information, and did not load data on LESNIK's laptop.

6.   On August 2, 2006, I learned the following from Doug Richmond, a Boeing Computer Security Officer:

a.   Earlier in 2006, LESNIK made a request to print an unclassified document from a Boeing classified computer, which Boeing granted.   To accomplish this, LESNIK filled out the required forms and obtained the approvals of multiple individuals that were required for printing the single unclassified document from the classified computer, and removing it from the secured area.   LESNIK followed the required procedures on that occasion. LESNIK has not requested or obtained approval to download or copy classified information onto the laptop computer.

b.   Even if LESNIK had made a request to download classified information, such a request would have been denied as a violation of procedures for maintaining classified information.

c.   Prior to his trip to Israel in June 2006, LESNIK made a request to Boeing Security to take his Boeing-issued laptop computer out of the country on a personal trip to Israel scheduled in June 2006.   Boeing Security denied LESNIK's request.

7.   On August 2, 2006, I learned the following from Matthew Dorrington, Boeing Information System Security Manager:

a.   Boeing issued the subject laptop to LESNIK for his sole use; LESNIK was assigned a unique user identification and was instructed to create a unique password to access the laptop. Boeing policies prohibit employees from disclosing the password to other employees.

b.   The following warning appears on each Boeing computer prior to a user's log-on:

27

> Welcome authorized users.  This system is
> company property.  Unauthorized access or use
> is prohibited and may be subject to
> discipline, civil suit or criminal
> prosecution. . . .

    c.   The forensics analysis showed that LESNIK's user identification was used when the classified information was loaded on LESNIK's laptop.

    d.   Boeing had issued LESNIK a virtual private network ("VPN") account for a personal computer LESNIK had at his home.

    e.   LESNIK had been trained on the storage and use of classified information, and had been advised about the penalties for mishandling classified information, including the possibility of criminal prosecution for violation of the laws governing classified information, specifically 18 U.S.C. § 793.  LESNIK also had signed documentation indicating that he had received training on the proper handling of classified information, which Mr. Dorrington provided to me.

    8.   On August 2, 2006, I reviewed correspondence from LESNIK's counsel, Michael Goodfriend, to Boeing's counsel, in which LESNIK's counsel objected to Boeing accessing the laptop computer on the ground that it contained LESNIK's personal information.  From this correspondence, I learned the following:

    a.   In a letter dated June 15, 2006, LESNIK's counsel asked that Boeing return the laptop to LESNIK, or, as an alternative, "to truly wipe clean the laptop's hard drive."

    b.   In a letter dated June 21, 2006, LESNIK's counsel admitted, "[t]he laptop also apparently contains sensitive, confidential and/or proprietary information and files from one or more other aerospace companies."

9.   On August 3, 2006, I interviewed Michael Connelly, the Boeing manager who confiscated LESNIK's laptop on May 25, 2006, who stated, in part, the following:

a.   He took possession of LESNIK's laptop due to LESNIK's repeated violations of Boeing policies governing the use of business equipment for personal purposes.  LESNIK's violation on May 25, 2006, the date the manager took possession of the laptop, involved LESNIK's personal use of the laptop during a business meeting with a Boeing customer.

b.   After he took the laptop, LESNIK became irrate, yelled at him, and told him that the disk drive should be destroyed if it was not going to be returned to LESNIK.

10.   On August 9, 2006, I reviewed a copy of LESNIK's resume, which was provided to me by Boeing.  The resume stated that from 1994 to 2000, LESNIK was employed at Northrop Grumman in Rolling Meadows, Illinois.  The resume also stated that in March 2000, LESNIK was employed at Raytheon.  The resume stated that LESNIK had "DoD Security Clearance: Secret, Special Access."

11.   On August 9, 2006, I reviewed LESNIK's security clearance file maintained at Boeing, which showed that on May 17, 2005, LESNIK received a Top Secret security clearance.

12.   On August 10, 2006, I spoke with Matthew Dorrington, who told me that when Boeing conducted the forensic analysis of the laptop computer, classified documents pertaining to Northrop Grumman and Raytheon were also located on the laptop.

13.   On August 10, 2006, I spoke with Jon Harrison, Boeing El Segundo Site Security Manager, who told me the following:

a.   Located at the Boeing facility where LESNIK worked
is a Sensitive Compartmented Information Facility ("SCIF").  (I
know based on my training and experience that a SCIF is a highly
secure physical location used for working with classified
materials).

b.   As part of his job responsibilities, LESNIK had
the requisite security clearance to work on classified materials
at Boeing, had authorized access to the Boeing SCIF through the
use of an electronic key card, and worked on classified documents
maintained in the SCIF.

c.   On the door leading into the SCIF there is a sign
that sets forth the items which are not permitted to be taken
into the SCIF.  (Mr. Harrison provided me with a copy of the
sign.  A copy of this sign will be attached to the government's
sentencing position as Exhibit 14.)

d.   Some of the documents found on the laptop computer
during the forensic analysis were classified documents that
should have been accessed and reviewed only in the SCIF and
should not have been removed from the SCIF without prior
authorization.

e.   VPN is the software used to access Boeing's
unclassified computer system.  A copy of this software has to be
installed on a remote computer, such as a personal computer, to
allow a person to log into Boeing's unclassified computer system
over the Internet.  The software is used by employees to increase
productivity.

14.  On or about August 17, 2006, I spoke with Jon Harrison,
Boeing El Segundo Site Security Manager, who told me while

30

1  searching an imaged copy of the hard drive of LESNIK's laptop
2  computer trying to identify classified documents, he observed a
3  directory named "financial" or something similar.  Within this
4  directory were directories named 2000, 2001, 2002 and 2003.
5  Within these directories, Harrison found correspondence to banks
6  and/or financial institutions in Munich, Germany; Zurich,
7  Switzerland; Tel Aviv, Israel; and Tijuana, Mexico.  (I have
8  since determined that there is no evidence that LESNIK was
9  banking in Mexico.)  Harrison read that LESNIK's father had died
10 and that LESNIK was either the executor or the beneficiary of his
11 father's estate.  The topics of the correspondence with the
12 banks/financial institutions included closing and transferring
13 accounts, liquidating gold and antique coins and inquiring about
14 how much money could be brought into the United States without
15 having to report it.  Harrison did not look at the documents
16 contained in these financial directories in great detail, but
17 recalls amounts in the thousands.
18     15.  Due to the sensitive nature of the classified
19 information found on the Boeing laptop computer, it was
20 transferred into a SCIF at the Defense Computer Forensics
21 Laboratory ("DCFL"), located in Linthicum, Maryland, for
22 examination.  On or about August 18, 2006, I received an
23 examination report from Janice Mallia, a Computer Forensic
24 Examiner at the DCFL.  The report was an interim examination
25 intended to locate files related to finances and banking accounts
26 on LESNIK's Boeing-issued laptop computer.  I reviewed the
27 documents sent to me by the DCFL and found the following, among
28 other correspondence:

31

a.   A letter from LESNIK, dated November 17, 2000, to a bank in Germany, instructing the bank to send US$45,000 to LESNIK prior to the renewal of the account.   LESNIK further instructed the bank to send all of LESNIK's father's correspondence to his care at LESNIK's address.   Another letter from LESNIK, dated July 5, 2002, to the same bank in Germany, instructed the bank to transfer all of LESNIK's funds, including 10,000 EUR to a financial institution in Switzerland.

b.   An e-mail, dated August 2, 2001, to LESNIK from a bank in Israel, which indicated that LESNIK had an account in Israel with a balance of US$185,741.11.

c.   A letter from LESNIK, dated April 28, 2004, to a financial institution in Switzerland, requesting the transfer of US$436,985 to LESNIK's sister in New York.

d.   Another letter from LESNIK, dated February 7, 2005, to the same financial institution in Switzerland in which LESNIK instructed the bank to sell VW coupons enclosed in the letter and hold the proceeds in his account.   LESNIK then instructed the financial institution to send him a check for $95,000 USD to his home address.

16.   On August 23, 2006, and August 24, 2006, along with other SAs of the FBI and SAs of the Air Force Office of Special Investigations (OSI), I executed federal search warrants at LESNIK's residence and on two of his vehicles.   During the search, the FBI seized, among other items, a number of computers, thumb drives, disk drives, floppy disks, CDs, and DVDs, and hard copies of LESNIK's email messages.   Subsequent review of the seized electronic materials by FBI, OSI, and Department of

32

1   Defense investigators revealed that classified information

2   related to the defense of the United States was present on a

3   number of these items.

4       17.   During the search of August 24, 2006, LESNIK and his

5   wife were served by FBI SA David Lang with federal grand jury

6   subpoenas for all computer equipment and storage devices and any

7   classified information.   LESNIK, through his attorney, did advise

8   that a computer that was included in the search warrant was

9   inadvertently left behind.   The computer was subsequently picked

10  up by the FBI.   However, LESNIK did not provide anything else as

11  a result of the federal grand jury subpoena.

12      18.   On September 7, 2006, Jon Harrison, El Segundo Site

13  Security Manager, Boeing Satellite Systems, gave FBI SA Cheney

14  Mak a copy of a Security Clearance Application, Standard Form 86

15  ("security application"), which LESNIK had signed and dated on

16  June 16, 2004, while he was employed by Boeing.   I know from

17  previous investigations and my training and experience that the

18  security application is a standard government application to be

19  completed by a person who seeks a security clearance.   Item

20  number 12 of the security application asks, "Do you have any

21  foreign property, business connections, or financial interests?"

22  LESNIK responded, "NO."   At the bottom of the security

23  application under the heading of Certification By Person

24  Completing Form, the form states, ". . . I understand that a

25  knowing and willful false statement on this form can be punished

26  by fine or imprisonment or both.   (See section 1001 of title 18

27  United States Code)."

28

19.   Seized in the search of LESNIK's residence on August 23, 2006, was a copy of another security application signed and dated by Lesnik on May 10, 2002, while LESNIK was working for the Raytheon Corporation, and hard copies of email messages between LESNIK (lesnikabra@aol.com) and employees of UBS, a financial institution in Switzerland.  Item number 12 of the security application asks, "Do you have any foreign property, business connections, or financial interests?"  LESNIK responded, "NO."  At the bottom of the security application, under the heading of Certification By Person Completing Form, the form states, "...I understand that a knowing and willful false statement on this form can be punished by fine or imprisonment or both.  (See section 1001 of title 18 United States Code)."

20.   During the search on August 23, 2006, the FBI also seized hard copies of emails between LESNIK and a financial institution in Switzerland.  In an email dated July 3, 2002, between LESNIK and an employee of UBS in Zurich, Switzerland, LESNIK instructs the employee to contact the Deutsche Bank to transfer funds from the Deutsche Bank to UBS.  In another email dated November 1, 2005, between LESNIK and a different UBS employee, Yves Arnet, Arnet writes that he would like to meet with LESNIK on November 18 at the W Hotel in Los Angeles.  Arnet writes therein, "...you currently have 500 shares (worth USD 27200) of VW and 130 Vorzugs-shares (worth USD 5300) of the same company."  In addition, bank records from the Israel Discount Bank, Tel Aviv, Israel, obtained from a search of LESNIK's residence on October 3, 2006, show that LESNIK had an account with this bank since 2001.  LESNIK failed to disclose these

34

1  foreign financial interests on the security applications he

2  submitted to the government in May 2002, and June 2004.

3       21.  On September 25, 2006, an FBI Investigative Specialist

4  ("IS"), who is assigned to the FBI Special Surveillance Group

5  ("SSG"), informed me that he and other SSG ISs had that day

6  observed LESNIK engage in actions consistent with counter-

7  surveillance activities.  On the morning of September 25, 2006,

8  SSG ISs observed LESNIK drive his vehicle to and park in a retail

9  parking lot.  LESNIK exited his vehicle, carrying a black bag,

10  and walked to an El Pollo Loco restaurant.  While in El Pollo

11  Loco, LESNIK did not appear to purchase anything.  LESNIK exited

12  El Pollo Loco after approximately five minutes and was then

13  observed walking back towards the vehicle, looking around

14  frequently and looking into other vehicles in the parking lot.

15  LESNIK opened his vehicle and looked inside.  LESNIK then walked

16  into a bakery and was observed inside the bakery looking back out

17  through the front of the bakery.  LESNIK did not appear to

18  purchase anything in the bakery.  LESNIK then left the bakery,

19  walked next door to a 99 Cent Store, entered the store and exited

20  approximately 10 seconds later.  LESNIK walked away from the

21  shopping and retail area and walked around a large block that was

22  more industrial than retail.  As LESNIK walked, he frequently

23  looked back over his shoulder, looked around and paused at

24  corners to look around.  During his walk, LESNIK made no stops.

25  After walking around the block, LESNIK was directly across the

26  street from Enterprise Self Storage on Sherman Way in North

27  Hollywood, California.  LESNIK walked from the sidewalk to the

28  street, stood in the street between two parked vehicles, looked

1   around and returned to the sidewalk.  LESNIK then returned to his
2   vehicle and drove to CW Contractors Warehouse, parked, looked
3   around, went inside and exited after approximately thirty
4   minutes.  LESNIK returned to his vehicle and was observed driving
5   towards his home.  LESNIK drove past the street his home was on
6   and made two turns before making a U-turn and heading back in the
7   direction of his home.  LESNIK was not further observed until
8   approximately seven minutes later when his vehicle was seen in
9   the driveway of his home.  The IS told me that during the above
10  activities, LESNIK was looking around more frequently than usual
11  while driving, was looking in his rear view mirror more often
12  than usual, and was exhibiting unusual driving patterns.  Also,
13  while walking, LESNIK exhibited unusual behavior and demeanor,
14  looking over his shoulder and looking around frequently.  The IS
15  explained that because he has observed LESNIK over several weeks
16  and knows LESNIK's typical behavior, it was unusual to see LESNIK
17  looking around as much as he did this day.  In my training and
18  experience, I know that subjects of investigations often are
19  watchful of law enforcement surveillance and employ counter-
20  surveillance techniques to elude law enforcement.  They often use
21  the above methods to spot any unknown vehicles that follow them,
22  namely law enforcement personnel.  Based on my training and
23  experience, I believe that LESNIK's actions on the morning of
24  September 25, 2006, were consistent with surveillance detection.
25       22.  On September 25, 2006, another IS from the FBI SSG
26  informed me that he and other SSG IS's saw LESNIK that afternoon
27  parking his vehicle at a strip mall 1½ blocks west of Enterprise
28  Self Storage.  The IS told me as follows:

36

1       a.   LESNIK exited his vehicle and walked to Enterprise

2 Self Storage carrying a black bag that did not appear to be full.

3 There were parking lots closer to Enterprise Self Storage and

4 there were empty parking spaces at Enterprise Self Storage.

5       b.   LESNIK entered Enterprise Self Storage and left

6 approximately ten minutes later carrying three bags that appeared

7 full.  All the bags were approximately the same size and at least

8 one looked like a notebook computer case.  LESNIK got in his

9 vehicle with the bags and drove home.

10   23.  On September 26, 2006, FBI SA William Dixion, Jr. gave

11 me copies of a rental agreement, a transaction history, and

12 receipts that he had obtained from Enterprise Self Storage.  The

13 rental agreement, signed by LESNIK, was dated July 31, 2006, and

14 is for storage space number S88.  The receipts and transaction

15 report show that LESNIK first paid the account with a $1 check on

16 August 13, 2006.  LESNIK made subsequent payments in cash, on

17 August 30, 2006, for $39.90, and on September 25, 2006, for

18 $58.95.  LESNIK paid the storage rental up to January 1, 2007.

19   24.  On September 28, 2006, FBI SA Dixion told me that on

20 September 27, 2006, the Manager of Enterprise Self Storage told

21 him that space S88 did not have a lock on it and when the manager

22 looked inside the storage space, it was empty.

23   25.  On October 3, 2006, based on new information from the

24 storage facility and surveillance, additional federal search

25 warrants were executed on LESNIK's residence and two vehicles by

26 SAs of the FBI and OSI.  During the search, the FBI seized, among

27 other items, a number of computers, a thumb drive, and an

28 external hard disk drive.  Subsequent examination of the seized

1  electronic materials by Department of Defense investigators

2  revealed that classified information related to the defense of

3  the United States was present on a number of these items.  One of

4  the items seized, an Acom external hard drive, contained 917

5  documents marked classified.  This hard drive was found in a

6  bathroom cupboard behind some books.  According to FBI SA Todd M.

7  Carter, who searched the cupboard in the search of August 24,

8  2006, the Acom external disk drive was not in the cupboard during

9  that search.

10     26.  On August 10, 2006, Jon Harrison, Boeing Security

11  Manager, gave me VPN logs from the Boeing unclassified network.

12  The logs showed LESNIK logging into the Boeing unclassified

13  network over the Internet from outside Boeing.  On October 5,

14  2006, FBI SA G. Ryan Macfarlane gave me a spreadsheet combining

15  the VPN records with the source registration of the connection to

16  the Boeing unclassified network.  The source registration is the

17  Internet service company that LESNIK used to connect to the

18  Boeing network.  The spreadsheet shows that LESNIK logged into

19  the Boeing unclassified network from the United Kingdom on

20  June 28, 2006, and from Tel Aviv, Israel, on June 29, 2006.

21     27.  I received a report dated September 3, 2008, from the

22  DCFL.  The DCFL conducted the computer forensics on the

23  electronic media seized in this matter.  According to the DCFL,

24  the total number of documents with classified markings of Secret

25  or Top Secret located on the electronic media seized in the

26  search warrants executed at LESNIK's residence plus the Boeing

27  laptop computer taken from LESNIK by Boeing Management is 2,076.

28  According to a Cyber Counterintelligence Investigator working for

1  a Department of Defense agency, if the documents were printed on

2  standard printer paper, they would form a stack of documents more

3  than 21 feet high.

4      28.  On November 5, 2008, the DCFL sent me a report, dated

5  October 23, 2008, that shows that files had been transferred

6  between a Swissbit thumb drive and LESNIK's Compaq laptop

7  computer while LESNIK was overseas.  The thumb drive and laptop

8  were seized in the searches of LESNIK's residence on August 24,

9  2006, and October 3, 2006, respectively.  The fact that the files

10  were moved while LESNIK was overseas shows that LESNIK took the

11  Compaq laptop with him on his trip.

12      29.  According to information I received from a Cyber

13  Counterintelligence Investigator working for a Department of

14  Defense agency, a cookie file located on the Compaq laptop was

15  last modified on July 5, 2006, while LESNIK was overseas.  (A

16  "cookie" is a short line of text that a web site puts on a

17  computer when that computer visits the web site.)  Due to the

18  unique identifying features of the cookie file and its contents,

19  the investigator had a high degree of confidence that the web

20  browsing activity was conducted from the Compaq laptop while that

21  laptop was logged on to an Israeli Internet access point.

22      30.  I received a memorandum from the DCFL on November 5,

23  2008.  The memorandum shows that nine PowerPoint files on the

24  //

25  //

26  //

27  //

28

Compaq laptop computer contained classified markings -- seven at the Secret level and two at the Top Secret level.  The DCFL discovered that all these PowerPoint files were created in 2005, except one that was created on February 4, 2006; these creation dates show that these nine files were on the Compaq laptop when LESNIK took the computer overseas.  Other, non-PowerPoint files containing classified documents could have been on the computer at that time as well -- and probably were, given their presence a short while later -- but this has not been proven forensically.

31.  I know from my training and experience, and discussions with the DCFL, that electronic media, such as thumb drives and computer hard drives, can be imaged (copied fully and identically) in such a way as not to leave electronic evidence that such an image was taken.

32.  The financial documents that are being attached to the government's sentencing memorandum as Exhibits 4, 5, and 6 were found by FBI agents searching LESNIK's residence.

33.  I declare under penalty of perjury that the foregoing information is true and correct.  Executed this 16th day of November, 2008, at Los Angeles, California.


ANTHONY F. GUARNIERI
Special Agent -- FBI

40